24-mj-6422-MPK<br>
24-mj-6423-MPK

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Special Agent Jeremy D. Brisson, being sworn, state as follows:

## INTRODUCTION

1. I am a Special Agent with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). I have been employed as an ATF Special Agent since 2023. As an ATF Special Agent, my duties include the investigation of violations of laws related to firearms trafficking, firearm possession by prohibited persons, and the use of firearms in drug trafficking crimes. I was the distinguished honor graduate of the ATF National Academy and of the Federal Law Enforcement Training Center. I possess an undergraduate degree in Finance. I am currently assigned to Group VI in the Boston Field Division of the ATF. This group works with other federal, state, and local police departments north of the City of Boston to investigate and prosecute violations of the federal firearms, explosives, and controlled substance laws. Prior to my employment with ATF, I had been in law enforcement in several capacities for approximately thirteen years. I was employed as a Deputy United States Marshal with the United States Marshal Service, a Federal Air Marshal with the U.S. Department of Homeland Security, and as a municipal law enforcement officer in the state of New Hampshire.

2. Currently, I am assigned to a group in the Boston Field Division of the ATF that, in part, works with other Federal, State, and Local Police Departments to investigate and prosecute violations of the Federal firearms, explosives, and controlled substance laws. My duties include working as a liaison between federal, state, and local law enforcement entities in the investigation of illegal distribution of narcotics, firearm offenses, and associated gang-related violent crimes. In the course of participating in investigations of drug distribution/trafficking, I

have conducted or participated in surveillance, the purchase of illegal drugs and firearms, the execution of search warrants, debriefings of subjects, witnesses, and informants and reviews of consensually recorded conversations and meetings.  Through my training, education, and experience, I have become familiar with the manner in which drug traffickers conduct their illegal drug trafficking activity, to include their use of cellular telephones to contact drug customers, drug runners, drug associates, and sources of illegal drug supply.  I am familiar with narcotics traffickers' methods of operation, including distribution, storage, and transportation of narcotics.

3. Based on my training and experience as a Special Agent, I am familiar with federal narcotics laws. I know that it is a violation of Title 21 U.S.C. §§ 841(a)(1) and 846 for any person to conspire to distribute, and to possess with intent to distribute, controlled substances.

## PURPOSE OF AFFIDAVIT

4. I submit this affidavit in support of a Criminal Complaint charging Thomas DINGMAN, a/k/a "Tommy," born 1995 ("DINGMAN") and Danielle STEENBRUGGEN, a/k/a "Daniella," born 1981 ("STEENBRUGGEN"), with violating Title 21, United States Code, Section 846 (conspiracy to distribute, and possess with intent to distribute, methamphetamine).

5. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports made to me by agents of the ATF and other federal, state and local law enforcement agencies.

6. I submit this affidavit for the limited purpose of establishing probable cause to believe DINGMAN and STEENBRUGGEN have committed the above offense.  Accordingly, I have not included each and every fact known to me and other law enforcement officers involved

in this investigation. I have set forth only the facts that I believe are needed to establish the requisite probable cause.

## PROBABLE CAUSE

### I. Investigation Background

7. ATF and the Massachusetts State Police ("MSP") are investigating a drug trafficking organization ("DTO") - involving DINGMAN, STEENBRUGGEN, and others - that has been distributing methamphetamine in the eastern Massachusetts area since at least October, 2023. Under the ATF's direction, an ATF cooperating witness ("CW-1") [1] has made several controlled buys of narcotics from DINGMAN and STEENBRUGGEN, which were audio and video recorded.

8. On March 25, 2024, CW-1 coordinated the purchase of approximately one (1) pound of methamphetamine from STEENBRUGGEN and DINGMAN at DINGMAN's residence, the TARGET LOCATION. Subsequent purchases occurred on April 25, 2024, May 6, 2024, and May 29, 2024, each for approximately one (1) pound of suspected methamphetamine from DINGMAN at the TARGET LOCATION, DINGMAN's residence in Haverhill, Massachusetts. [2]

---

[1] CW-1 is cooperating for the purpose of seeking consideration towards charging and sentencing related to an ongoing federal firearm-related investigation. CW-1 has a criminal history that includes prior arrests and convictions for violation of a restraining order, assault and battery, carrying a dangerous weapon, interfering with a police officer, driving under the influence of drugs or alcohol, burglary, theft and drug possession. At the direction of law enforcement, the CW-1 has identified, and corroborated, events and individuals involved in active criminal investigations, including having conducted controlled purchases of evidence in conjunction with this criminal investigation. Based on corroboration during this investigation, including recordings, I believe that CW-1's information is reliable.

[2] I am aware of DINGMAN's residential address, hereinafter referred to as the TARGET LOCATION. I am not including that specific address for the purpose of this affidavit in support of a criminal complaint.

## II.     Controlled purchases at the TARGET LOCATION

    a.  March 25, 2024

9. In March of 2024, CW-1 coordinated the purchase of approximately one (1) pound of suspected methamphetamine through STEENBRUGGEN.  STEENBRUGGEN had been coordinating previous methamphetamine controlled purchases with CW-1 for several months.  Following the arrest of a former supplier of methamphetamine known to STEENBRUGGEN in early March 2024, STEENBRUGGEN advised CW-1 that she could get CW-1 the same price for the same weight with another supplier.

10. On March 25, 2024, STEENBRUGGEN directed CW-1 to the TARGET LOCATION in order to purchase one (1) pound of methamphetamine.  Following a series of communications between STEENBRUGGEN and CW-1, law enforcement officers followed a set of procedures whereby they searched CW-1 and his/her vehicle for contraband.  Law enforcement officers provided CW-1 with an audio-video recording device [3] and an agreed-upon amount of official agency funds ("OAF") to complete the drug purchase. Law enforcement officers then surveilled CW-1 to the TARGET LOCATION.

11. Prior to entering the TARGET LOCATION, CW-1 was advised by STEENBRUGGEN that the home was the residence of "Tommy," later identified as DINGMAN. Shortly after CW-1 arrived at the residence, STEENBRUGGEN and a male named "John" [4] also arrived at the TARGET LOCATION.  After arriving, CW-1, Steenbruggen and "John" then entered the TARGET LOCATION using the front door on the left side, and

---

[3] During this controlled purchase, agents learned that CW-1 had removed an outer garment containing the recording device prior to entering the TARGET LOCATION.  As a result, the exchange within the TARGET LOCATION was not captured on audio/video recording.

[4] The identify of "John" is known to law enforcement.  I am not including that individual's name for the purpose of this affidavit in support of a criminal complaint.

4

DINGMAN was inside. Shortly thereafter, two Hispanic males [5] arrived at the TARGET LOCATION with suspected methamphetamine.

12.   During the controlled purchase, STEENBRUGGEN told CW-1 that the methamphetamine would be delivered by "Tommy's guy." After CW-1 provided the OAF to DINGMAN, one of the two Hispanic males handed CW-1 a bag of suspected methamphetamine. When receiving the suspected methamphetamine, CW-1 stated that he/she did not trust DINGMAN or the Hispanic males and wanted the bag of suspected methamphetamine weighed. One of the Hispanic males produced a scale and the bag weighed approximately 454 grams. At this time, DINGMAN got up from the couch and opened a desk drawer on a nearby computer stand. CW-1 observed that the drawer appeared to contain more methamphetamine and a Glock pistol. DINGMAN stated that he could add some methamphetamine to the bag, as the bag was "light," but CW-1 declined the offer. DINGMAN advised CW-1 that he wanted to cut himself out of future transactions but would host future transactions at his residence for a fee. CW-1 left the TARGET LOCATION following the transaction.

13.   After CW-1 left the meeting location, law enforcement officers surveilled CW-1 as he/she left the pre-arranged meeting location, and then met with CW-1 at a predetermined location for a debriefing. During the debriefing, CW-1 provided law enforcement officers with the bag of suspected methamphetamine. Law enforcement officers then searched CW-1 and his/her vehicle again, with negative results. The suspected methamphetamine was entered into evidence and subsequently sent to the DEA Laboratory, which found that the substance was identified as 438.6 grams of pure methamphetamine.

---

[5] I have learned that these two Hispanic males are subjects of a separate DEA investigation into a DTO believed to be selling fentanyl, cocaine, and methamphetamine and laundering drug proceeds.

b. <u>April 25, 2024</u>

14.     In April, 2024, at the direction of investigators, CW-1 coordinated another purchase of one (1) pound of suspected methamphetamine through STEENBRUGGEN. On April 25, 2024, law enforcement officers again followed the above-described procedures for the controlled purchase and STEENBRUGGEN again directed CW-1 to the TARGET LOCATION in order to purchase the methamphetamine.

15.     Prior to entering the TARGET LOCATION, CW-1 was met by STEENBRUGGEN and "John." CW-1, STEENBRUGGEN, and "John" then entered the TARGET LOCATION using the front door on the left side. DINGMAN was inside the TARGET LOCATION. Shortly thereafter, a Hispanic male, one of the same two Hispanic males from the previous controlled purchase, arrived at the TARGET LOCATION with suspected methamphetamine.

16.     During the controlled purchase, the Hispanic male provided the suspected methamphetamine to CW-1 in exchange for the OAF. Following the transaction, CW-1 observed DINGMAN and STEENBRUGGEN begin splitting the proceeds on CashApp, which is a mobile payment service that allows users to transfer money to one another using a mobile phone app. Following the controlled purchase, CW-1 provided his/her phone number to DINGMAN so they could communicate directly for future transactions. DINGMAN advised CW-1 that future purchases of one (1) pound of methamphetamine would go from $4,000 to $3,500. CW-1 left the TARGET LOCATION following the transaction. At approximately 8:33pm, CW-1 received a text message from the telephone number 978-886-2204 (later identified as DINGMAN's cell phone) stating "yeah we can work out a lot better" and "What's your iPhone".

17.     After CW-1 left the meeting location, law enforcement officers surveilled CW-1 as he/she left the pre-arranged meeting location, and then met with CW-1 at a predetermined location for a debriefing. During the debriefing, CW-1 provided law enforcement officers with the bag of suspected methamphetamine. Law enforcement officers then searched CW-1 and his/her vehicle again, with negative results.  I have also reviewed the video recording of this controlled purchase and determined that it was consistent with the details described by CW-1. The bag contained a white crystalline substance.  Based on my training and experience, as well as that of other agents familiar with this investigation, the substance is believed to be methamphetamine.   Additionally, I believe this based on various factors, including the information learned during the course of this investigation and the packaging, size, shape & color of the substance.  The suspected methamphetamine was entered into evidence and subsequently sent to the DEA Laboratory for further testing, which is currently pending.

    c.  <u>May 6, 2024</u>

18.     In May, 2024, at the direction of investigators, CW-1 coordinated another purchase of one (1) pound of suspected methamphetamine following direct communication with DINGMAN.  On May 6, 2024 law enforcement officers again followed the above-described procedures for the controlled purchase and DINGMAN directed CW-1 to the TARGET LOCATION in order to purchase the methamphetamine.

19.     Prior to CW-1 entering the TARGET LOCATION, investigators observed DINGMAN leave the TARGET LOCATION.  CW-1 then entered the TARGET LOCATION using the front door on the left side and he/she was greeted by a male party with a facial tattoo, who is believed to be DINGMAN's roommate and not involved in the above-referenced drug transactions. Shortly thereafter, DINGMAN returned to the TARGET LOCATION and met with

CW-1 in the TARGET LOCATION. Some time later, a Hispanic male, one of the same two Hispanic males from the previous controlled purchase, arrived at the TARGET LOCATION with suspected methamphetamine.

20.     During the controlled purchase, the Hispanic male provided the suspected methamphetamine to DINGMAN. After weighing the bag of suspected methamphetamine, DINGMAN provided the suspected methamphetamine to CW-1, and CW-1 provided the OAF to DINGMAN.  Additionally, DINGMAN and CW-1 had a brief discussion about "AR" lower receivers, which I believe based on my training and experience is a reference to firearm frames for AR-15-style rifles. CW-1 left the TARGET LOCATION after the drug transaction was complete.

21.     After CW-1 left the meeting location, law enforcement officers surveilled CW-1 as he/she left the TARGET LOCATION, and then met with CW-1 at a predetermined location for a debriefing. During the debriefing, CW-1 provided law enforcement officers with the bag of suspected methamphetamine. Law enforcement officers then searched CW-1 and his/her vehicle again, with negative results.  I have also reviewed the video recording of this controlled purchase and determined that it was consistent with the details described by CW-1.  The bag contained a white crystalline substance.  Based on my training and experience, as well as that of other agents familiar with this investigation, the substance is believed to be methamphetamine.   Additionally, I believe this based on various factors, including the information learned during the course of this investigation and the packaging, size, shape & color of the substance.  The suspected methamphetamine was entered into evidence and subsequently sent to the DEA Laboratory for further testing, which is currently pending.

      d. <u>May 29, 2024</u>

22.     Again in May, 2024, at the direction of investigators, CW-1 coordinated another purchase of one (1) pound of suspected methamphetamine following direct communication with DINGMAN.  On May 29, 2024, law enforcement officers again followed the above-described procedures for the controlled purchase and DINGMAN directed CW-1 to the TARGET LOCATION in order to purchase the methamphetamine.

23.     Prior to entering the TARGET LOCATION, CW-1 entered the TARGET LOCATION using the front door on the left side. DINGMAN was inside the TARGET LOCATION.  Also inside the residence was a female who went by "Johanna" and DINGMAN's roommate, "Mike." Once inside, DINGMAN discussed a purchase of 2 pounds of methamphetamine instead of 1 pound, and also asked CW-1 to buy 1 ounce from the pound that CW-1 was purchasing from DINGMAN's source, to which CW-1 declined.  Shortly thereafter, a Hispanic male, one of the same two Hispanic males from the previous controlled purchase, arrived at the TARGET LOCATION with suspected methamphetamine.

*24.*     During the controlled purchase, the Hispanic male placed the bag of suspected methamphetamine on a scale, and it weight approximately 16 ounces.  CW-1 then picked up the bag of suspected methamphetamine from the scale and CW-1 provided the OAF to the Hispanic male.  CW-1 left the TARGET LOCATION after the drug transaction was complete.

25.     After CW-1 left the meeting location, law enforcement officers surveilled CW-1 as he/she left the TARGET LOCATION, and then met with CW-1 at a predetermined location for a debriefing. During the debriefing, CW-1 provided law enforcement officers with the bag of suspected methamphetamine. Law enforcement officers then searched CW-1 and his/her vehicle again, with negative results.  I have also reviewed the video recording of this controlled purchase

and determined that it was consistent with the details described by CW-1. The bag contained a white crystalline substance. Based on my training and experience, as well as that of other agents familiar with this investigation, the substance is believed to be methamphetamine. Additionally, I believe this based on various factors, including the information learned during the course of this investigation and the packaging, size, shape & color of the substance. The suspected methamphetamine was entered into evidence and subsequently sent to the DEA Laboratory for further testing, which is currently pending.

## **CONCLUSION**

26.     Based on the foregoing, there is probable cause to believe that on various dates, including from on or about March 25, 2024 through on or about May 29, 2024, in Haverhill, in the District of Massachusetts, and elsewhere, that DINGMAN and STEENBRUGGEN, did conspire to distribute, and possess with intent to distribute, methamphetamine, in violation of Title 21, United States Code, Section 846.

I declare the foregoing is true and correct.

/s/ Jeremy D. Brisson

_____
Jeremy D. Brisson
Special Agent, ATF

Signed electronically and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on this __ day of June, 2024.     June 12, 2024

_____
HON. M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS